UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL PAUL TUDOR,

          Petitioner,                                          Hon. Paul L. Maloney

v.                                                                    Case No. 1:05-CV-827

SHIRLEE HARRY,

          Respondent.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Tudor's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Tudor's petition be **denied**.

## BACKGROUND

As a result of events which occurred on November 9, 1998, Petitioner was charged with first degree murder and possession of a firearm during the commission of a felony. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Officer Brian Segrest**

As of February 1, 1998, Segrest was employed as a Redford Township police officer. (Trial Transcript, July 14, 1999, 5).  At approximately 10:30 p.m. that evening, Segrest was dispatched to Shannon Bahorski's residence.  (Tr. 5-7).  Bahorski contacted the police to make a "missing person/suicidal person" report concerning Petitioner, Michael Paul Tudor.  (Tr. 5-8). Bahorski also gave Segrest a suicide note that Petitioner had written.  (Tr. 8-13).

**Officer Kevin Crittenden**

As of February 2, 1998, Crittenden was employed as a police officer in Redford Township.  (Trial Transcript, July 14, 1999, 15).  In the early morning hours of February 2, 1998, Crittenden was dispatched to a local hospital where he observed medical personnel providing emergency care to Petitioner.  (Tr. 15-17).

**Susan Boone**

Boone was Mikel Mathis' mother.  (Trial Transcript, July 13, 1999, 101).  In May 1998, Mathis purchased a red 1998 Mustang Cobra.  (Tr. 103).  On November 6, 1998, Mathis told his mother that he was dating Shannon Bahorski.  (Tr. 102).

**Sirilla Mulligan**

On the evening of November 9, 1998, Mulligan drove to a location in Detroit near the intersection of Grand River and Salem to pick up her daughter from work.  (Trial Transcript, July 13, 1999, 105-06).  At approximately 9:45 p.m. Mulligan entered an alley to wait for her daughter.

2

(Tr. 106-07).  Upon entering the alley, Mulligan encountered a red car that was "blocking [the] way."
(Tr. 106-08).  Mulligan flashed her lights at the red car in an attempt to get the driver's attention.
(Tr. 110).  The driver moved, but did not otherwise respond.  (Tr. 110).  Mulligan thought that the
driver was drunk, but as she passed the car she noticed an empty carton of Kool cigarettes on the
windshield.  (Tr. 107-10, 113).  Mulligan "didn't like the look" of that, so she "flagged down a
police car."  (Tr. 108-11).  Mulligan told the officers that there was a "drunk driver" in the red car,
at which point the officers proceeded to the car.  (Tr. 111-12).  Mulligan then departed the area.  (Tr.
111-12).  Mulligan estimated that "a couple of minutes" passed between the time she entered the
alley and when she spoke with the police officers.  (Tr. 112).


**Officer William Niarhos**

As of November 9, 1998, Niarhos was employed as a police officer with the City of
Detroit, assigned to the Evidence Technician Unit.  (Trial Transcript, July 13, 1999, 124).  At
approximately 11:35 p.m. that evening, Officer Niarhos was dispatched to a location near the
intersection of Grand River and Salem.  (Tr. 125, 130).  Niarhos was instructed to photograph the
scene and collect evidence.  (Tr. 125-26).

When he arrived at the scene, Niarhos observed a Mustang vehicle sitting in an alley.
(Tr. 127).  An examination of the exterior of the vehicle revealed that an empty carton of Kool
cigarettes had been placed under one of the windshield wipers.  (Tr. 127-28).  Niarhos also
discovered a pair of eye glasses on the roof of the vehicle, on the driver's side.  (Tr. 139-41).  An
examination of the car's interior revealed "blood smears" and "blood spots" on the driver's seat and
headrest.  (Tr. 131).  Blood spots were also observed on the pavement directly underneath the

3

driver's side door.  (Tr. 135-36).  Officer Niarhos, however, discovered no blood on the passenger side of the vehicle's interior.  (Tr. 133).  On the floor behind the driver's seat, Officer Niarhos discovered a green cloth baseball hat with the words "Shwag Daddy" on the exterior.  (Tr. 134, 141-42).  The hat had a "couple" of puncture holes and was stained with blood on the right side.  (Tr. 141).  The keys to the car were still in the ignition.  (Tr. 149).

**Rukeya Quine**

As of November 9, 1998, Quine was employed as a police officer for the City of Detroit.  (Trial Transcript, July 14, 1999, 18).  At approximately 10:15 p.m. that evening, Officer Quine and her partner were "flagged. . .down" near the intersection of Grand River and Salem by a woman who directed her to a red Mustang parked nearby.  (Tr. 18-21).

As Quine and her partner approached the car, Quine noticed that the driver's door was ajar.  (Tr. 21-22).  Quine then observed a white male sitting in the driver's seat.  (Tr. 23).  Quine stated to her partner that "he's not moving. . .I believe he's dead."  (Tr. 23).  At that point, the man sitting in the driver's seat responded, "I'm not dead yet."  (Tr. 23-24).  After requesting medical assistance, Quine began speaking with the man.  (Tr. 24-25).  When asked, "what happened?," the man stated that "I've been shot by Michael Tudor."  (Tr. 25).  The man then repeated this statement. (Tr. 25-26).  Officer Quine experienced no difficulty understanding what the man said.  (Tr. 26). The man was subsequently removed from the car, at which point Officer Quine observed "several gunshot wounds to the side of [the man's] head.  (Tr. 26-31).

**Officer Michael Scanlon**

As of November 9, 1998, Scanlon was employed as a police officer for the City of Detroit. (Trial Transcript, July 14, 1999, 51). On the evening of November 9, 1998, Scanlon responded to a call for assistance near the intersection of Grand River and Salem. (Tr. 51-52). Upon arriving at the scene, Scanlon began attending to the victim, who was sitting in the driver's seat of a red Mustang. (Tr. 52-53). The victim was removed from the Mustang and placed in the rear of Scanlon's vehicle for immediate transport to a nearby hospital. (Tr. 53-55). As Scanlon drove to the hospital, the victim "kept stating over and over that Michael Tudor shot [him]." (Tr. 55-56). The man told Officer Scanlon that Michael Tudor was "his girlfriend's ex-boyfriend." (Tr. 56).

**Sharon Bahorski**

Sharon Bahorski is Shannon Bahorski's mother. (Trial Transcript, July 14, 1999, 62-63). Sharon Bahorski indicated that she had known Petitioner for 10 years and that she treated him like a son. (Tr. 86, 95). Bahorski testified that Petitioner had been her daughter Shannon's boyfriend until February 1998. (Tr. 64). Bahorski indicated that from February 1998 through November 1998, Shannon Bahorski and her children (conceived with Petitioner) lived with her. (Tr. 64, 89).

Bahorski related an incident with Petitioner that occurred on November 9, 1998. (Tr. 64- 79, 90, 94). On the day in question, Bahorski drove Petitioner to a doctor's appointment. (Tr. 64-65, 94). During the drive, Petitioner, believing that Shannon Bahorski was dating Mikel Mathis, told Sharon Bahorski that he would "cut off" Mathis' ear and send it to Shannon Bahorski. (Tr. 63-66, 90). Petitioner was "upset" because he thought that Shannon Bahorski was dating Mikel Mathis.

(Tr. 90).  Petitioner was upset that his kids might refer to another man as "Dad."  (Tr. 90).  Petitioner was also upset that if Shannon was dating someone else his chances of "getting back with" her might be lost.  (Tr. 90).

After Petitioner's doctor appointment, Sharon Bahorski asked Petitioner to give her some of his pain medication because her knee "really hurt."  (Tr. 73).  Petitioner obliged and gave Bahorski several pills.  (Tr. 73-74, 96-97).  Bahorski took the pills, but became ill later that day and went to the hospital.  (Tr. 68, 79).  While Bahorski was at the hospital, she was visited by Mikel Mathis and other members of his family.  (Tr. 103).  Bahorski was subsequently released from the hospital and she returned home.  (Tr. 79).  Later that evening, Bahorski went to Petitioner's father's residence to speak with Petitioner.  (Tr. 79-80).  Bahorski arrived at approximately 9:30 p.m., but Petitioner was not present.  (Tr. 80).

Soon thereafter, Petitioner telephoned his father's residence and spoke with Sharon Bahorski.  (Tr. 80-81).  During this conversation Bahorski told Petitioner, "you have to give yourself up because they know that Mikey was shot."  (Tr. 81).  Petitioner responded that he "didn't do it."  (Tr. 81).  Petitioner, who was at a pay phone, then stated, "the police just went by, I gotta go."  (Tr. 82).  At no point during this conversation did Petitioner indicate that he was hurt or that he had acted in self-defense.  (Tr. 85-86).  Bahorski also testified that she owned a .32 caliber handgun which she kept in her house.  (Tr. 74-78).

**Dr. Ruben Ortiz-Reyes**

As of November 1998, Dr. Ortiz-Reyes was employed by Washtenaw County as a forensic pathology consultant.  (Trial Transcript, July 14, 1999, 111).  Dr. Ortiz-Reyes testified that

Mikel Mathis passed away on November 21, 1998. (Tr. 140). The following day, Dr. Ortiz-Reyes performed an autopsy on Mathis. (Tr. 140). The doctor recovered two bullets from Mathis' brain. (Tr. 130). The autopsy revealed that Mathis died as a result of four gunshot wounds to the right side of his head. (Tr. 117-33). The autopsy revealed no evidence that Mathis was involved in a struggle prior to suffering the fatal gunshot wounds. (Tr. 133). Dr. Ortiz-Reyes testified that because of the various medical treatment (including surgery) Mathis received between the time of his injury and his subsequent death, it was not possible to determine the distance from which the fatal shots were fired. (Tr. 122-25, 141-42).

### Shannon Bahorski

Bahorski began dating Petitioner in 1988. (Trial Transcript, July 14, 1999, 149-50). Petitioner and Bahorski subsequently had two children together, the first born in April 1994 and the second born in November 1995. (Tr. 152-53). Bahorski testified that between November 1995 and February 1998, her relationship with Petitioner was "volatile at best most times." (Tr. 153-54).

In February 1998, Bahorski moved back home with her parents. (Tr. 154). A day or two later, Bahorski found a suicide note written by Petitioner on the steering wheel of her car. (Tr. 155-58). Fearful that Petitioner was "going to go out and do something to hurt himself," Bahorski and several other individuals "went out driving around" looking for Petitioner. (Tr. 157). Bahorski returned home a couple hours later and found Petitioner "passed out" in his truck. (Tr. 157). Bahorski drove Petitioner to the hospital where he received medical treatment. (Tr. 158-59). Following this incident, Bahorski and Petitioner had contact with each other "to drop the kids off or have [Petitioner] pick the kids up," but otherwise were not involved with each other. (Tr. 159).

7

Bahorski began dating Mikel Mathis in September 1998.  (Trial Transcript, July 15, 1999, 18).  At the time, Petitioner lived approximately three blocks away from Bahorski.  (Trial Transcript, July 14, 1999, 165).  On November 3, 1998, Petitioner asked Bahorski to marry him.  (Trial Transcript, July 15, 1999, 5).  Bahorski declined Petitioner's offer.  (Tr. 6).

On the evening of November 4, 1998, Mathis, Bahorski and Bahorski's two children went "to the show."  (Trial Transcript, July 14, 1999, 165).  When the group returned to the Bahorski residence, Petitioner was present talking with Sharon Bahorski.  (Tr. 165-67).  Shannon Bahorski introduced Petitioner to Mikel Mathis.  (Tr. 167).  The two "shook hands and that was the extent of it."  (Tr. 167).  This exchange was "not friendly, but cordial."  (Tr. 168).  Immediately after meeting Mathis, Petitioner departed.  (Tr. 167).

Two days later, on November 6, 1998, Bahorski and her two children spent the day with Mathis.  (Tr. 168-69).  After the group returned to Bahorski's residence, Petitioner telephoned Bahorski and insisted that "there was no reason for [Bahorski] and the kids. . .to be spending the whole day with [Mathis]."  (Tr. 168-69).  Bahorski informed Petitioner that "it really wasn't any of his business," at which point she hung up the phone.  (Tr. 168-69).  Approximately five minutes later, Petitioner arrived at Bahorski's residence wielding a baseball bat.  (Tr. 168-70).

Bahorski went outside and confronted Petitioner, who had "begun to tap on the back of" Mathis' Mustang with his baseball bat.  (Tr. 163, 170).  When Bahorski told Petitioner to stop, Petitioner "just kept telling [Bahorski] to tell Mikel to come outside."  (Tr. 170).  Bahorski refused, telling Petitioner that "there was no reason for all of this to go on in front of the kids."  (Tr. 170).  Petitioner, however, "wouldn't quit."  (Tr. 170).  Bahorski repeatedly asked Petitioner to leave and told him that if he did not leave, she would call the police.  (Tr. 170-71).  Petitioner refused to leave

8

and kept demanding that Mathis "come outside." (Tr. 171).  By this time, Petitioner had become so loud that a neighbor, Ms. Millross, stepped outside and asked Petitioner to stop.  (Tr. 171). Petitioner told her "to mind her own fucking business."  (Tr. 171).

At this point, Mathis exited the residence.  (Tr. 172).  When Mathis asked Petitioner "what the problem" was, Petitioner told Mathis that he "don't need to be spending the day around [his] kids."  (Tr. 173).  Mathis, without raising his voice, told Petitioner that if Bahorski did not have a problem with the situation, neither should he.  (Tr. 173).  Petitioner then began to point his baseball bat at Mathis' face.  (Tr. 176-77).  Mathis "moved back to avoid being hit with the bat" and then told Petitioner that "he doesn't have a problem with him, he doesn't even know him and he doesn't understand what the problem is."  (Tr. 177).  Petitioner told Mathis "to stay away from his kids" and then walked to his truck.  (Tr. 177).  As he drove away, Petitioner told Bahorski and Mathis that they "better watch [their] fucking backs because it's not over."  (Tr. 178).  Over the course of the next two days, Bahorski spoke with Petitioner on the telephone twice, but did not see him in person.  (Tr. 179-81).

Petitioner had custody of his two children on November 9, 1998.  (Tr. 181-82).  Mikel Mathis picked Bahorski up from work that day because her car was not working.  (Tr. 181-82).  After she arrived home from work, Bahorski telephoned Petitioner and told him that she and Mathis would stop by to pick up the kids.  (Tr. 182).  Petitioner responded that he "didn't want Mike Mathis at his house."  (Tr. 182).  Bahorski told Petitioner, "that's fine," and instead requested that Petitioner return the children to her residence.  (Tr. 183).  Petitioner agreed.  (Tr. 183).  Ten minutes later, however, Bahorski telephoned Petitioner to find out why he had not returned the children.  (Tr. 183). Petitioner responded by asking Bahorski when she was "going to stop bringing Mikel Mathis around

9

the kids." (Tr. 183). Bahorski told Petitioner that if he did not bring her children home, she would contact the police. (Tr. 183). Soon thereafter, Petitioner arived at Bahorski's residence with the children. (Tr. 183).

When Petitioner arrived, Bahorski "walked outside to get the kids" while Mathis stood in the doorway. (Tr. 184). Petitioner was "upset" and asked Bahorski whether "he" (referring to Mathis) had "something to say" to him. (Tr. 184-85). Bahorski responded that "he probably does," at which point she returned to her house with the kids. (Tr. 184). After Bahorski entered the house, Mathis exited and spoke with Petitioner. (Tr. 184-86). Bahorski was unable to hear this conversation, but she could see that Petitioner was "upset." (Tr. 186). Mathis soon returned to the house and informed Bahorski that Petitioner wanted to speak with her. (Tr. 186-87). When Bahorski went outside Petitioner asked her if she was "fucking" Mathis. (Tr. 187-88). Bahorski told Petitioner that it was none of his business. (Tr. 188). Bahorski also told Petitioner that "it was over" between them and that "he needed to leave." (Tr. 188). Petitioner left. (Tr. 188). Bahorski estimated that Petitioner left at approximately 6:15 p.m. (Tr. 187-88).

At approximately 6:30 p.m., Bahorski, Mathis, and Bahorski's children departed Bahorski's residence in Mathis' car. (Tr. 189-90). They first went to the police station to report the November 6, 1998 incident in which Petitioner went to Bahorski's residence with a baseball bat. (Tr. 189-90). After reporting this incident, the group went shopping at Meijer. (Tr. 190-91). After they finished shopping, the group returned to Bahorski's residence. (Tr. 191-94).

Bahorski was also surprised that Petitioner was present at her house. (Tr. 192-93). Bahorski observed that Petitioner was "very calm," in contrast to earlier that evening when he was "quite upset." (Tr. 193-94). Bahorski subsequently observed Petitioner enter her mother's bedroom

10

and shut the door behind him.  (Trial Transcript, July 14, 1999, 194-95; Trial Transcript, July 15, 1999, 53).  When Petitioner entered the bedroom there were no other adults in the room.  (Trial Transcript, July 14, 1999, 195).  Petitioner then approached Mathis and asked him if had to work that night.  (Tr. 193, 195).  Mathis indicated that he did, but not until 10:45 p.m.  (Tr. 193).  Petitioner then stated to Mathis, "if you're going to be hanging out with the kids we have some things that we need to talk about."  (Tr. 194).  Mathis agreed and the pair agreed to go "get a cup of coffee."  (Tr. 194-97, 199).  Between 9:15 and 9:30 p.m. Mathis and Petitioner departed in Mathis' vehicle.  (Tr. 197).  Mathis was driving and Petitioner was sitting in the front passenger seat.  (Tr. 197).  Mathis was wearing a green baseball hat with the words Shwag Daddy on the front.  (Tr. 208).

Bahorski waited until approximately 9:45 p.m. for Mathis to return.  (Tr. 198).  When he failed to do so, Bahorski began repeatedly paging Mathis and Petitioner.  (Tr. 198).  When neither Petitioner nor Mathis returned her pages, Bahorski began driving around in an attempt to locate them.  (Tr. 198).  Bahorski was unsuccessful and returned home at approximately 10:40 p.m.  (Tr. 198-204).  Soon thereafter, a Redford Police Officer arrived at her house and informed her that Mikel Mathis had been shot.  (Tr. 204-05).

Bahorski testified that Mathis smoked Kool brand cigarettes and that on the night he was shot there was a carton of Kool cigarettes in the back seat of his car.  (Tr. 206-10).  Bahorski testified that the empty cigarette carton recovered from the windshield of Mathis' car "looks like" the cigarette carton that was in the back of Mathis' car on the night he was shot.  (Tr. 210-11).

11

**Virginia Millross**

Millross testified that she had lived "right next door" to the Bahorskis for the past ten years.  (Trial Transcript, July 15, 1999, 84-85).  On the afternoon of November 6, 1998, Petitioner drove into her driveway and exited his truck carrying a baseball bat.  (Tr. 85-87).  Petitioner walked to the Bahorski residence.  (Tr. 87-88).  Shannon Bahorski exited her house, at which point she and Petitioner began arguing.  (Tr. 88-89).  After the pair had been arguing for some time, Millross told Petitioner that "he should leave or [she] was going to go call the police."  (Tr. 90).  Petitioner told Millross "to fuck off and go in [her] own house and mind [her] business."  (Tr. 90-91).

**Paul Bahorski**

Paul Bahorski is Shannon Bahorski's father and Sharon Bahorski's husband.  (Trial Transcript, July 15, 106).  Bahorski acquired a .32 caliber handgun in September 1997, which he stored in a cardboard box in his bedroom closet.  (Tr. 107-10).  The day after Mikel Mathis was shot, Bahorski discovered that this weapon was missing.  (Tr. 111-15).

**Thomas Hysell**

Hysell had been "pretty good friends" with Petitioner for several years.  (Trial Transcript, July 15, 1999, 131).  On the evening of November 9, 1999, "sometime before midnight but after nine," Petitioner telephoned Hysell and asked him to "come up to City Limits Bar to give him a ride."  (Tr. 118-19).  Hysell testified that the City Limits Bar was located on Fenton near Grand River.  (Tr. 121-22).  When Hysell arrived at the City Limits Bar, Petitioner entered Hysell's truck.  (Tr. 125).  Petitioner did not appear to be upset.  (Tr. 131).  Petitioner told Hysell to drive him

to the Longshots bar.  (Tr. 126).  Hysell saw no evidence that Plaintiff was injured or has been in a

fight, noting that "had there been blood or something [he would have] noticed."  (Tr. 125).

Petitioner made no comments indicating that he had just been in a fight or had been forced to defend

himself.  (Tr. 129-31).  Hysell dropped Petitioner off at Longshots and returned home.  (Tr. 133).


**Officer Paul Champoux**

As of November 9, 1998, Champoux was employed as a Redford Township Police

Officer.  (Tr. 138-39).  At approximately 7:45 p.m. that evening Shannon Bahorski arrived at the

Redford Township Police Station to make a complaint regarding incidents that occurred on

November 6, 1998, and November 9, 1998.  (Tr. 139-41).  After completing the forms she had been

given, Bahorski departed the police station.  (Tr. 142).


**Inspector Steven Wilkinson**

As of November 9, 1998, Wilkinson was employed as an Inspector for the Redford

Township Police Department.  (Trial Transcript, July 15, 1998, 144-45).  At approximately 6:23 p.m.

on November 9, 1998, Wilkinson executed a traffic stop after observing Petitioner driving 19 miles

per hour faster than the posted speed limit.  (Tr. 145-47, 155).  Wilkinson issued Petitioner a citation,

at which point Petitioner stated that "he was having a bad day and he just caught his girlfriend

cheating on him."  (Tr. 147).

At approximately 10:30 p.m. that evening, Wilkinson was dispatched to a location

near the intersection of Grand River and Salem.  (Tr. 147-49).  Wilkinson was informed by Officer

Quine that a man had been shot by "Michael Tudor."  (Tr. 149-51).  When Wilkinson made the

13

connection between the man he had stopped earlier that day (and who had complained that he had

just caught his girlfriend cheating on him) and the man who had allegedly committed this crime,

Wilkinson instructed officers to go to Petitioner's residence.  (Tr. 151).


**Officer Kevin Riley**

As of November 9, 1998, Riley was employed as a Redford Township Police Officer.

(Trial Transcript, July 15, 1998, 157-58).  At approximately 3:30 a.m. on November 10, 1998,

Officer Riley initiated a traffic stop and arrested Petitioner.  (Tr. 158-69).  Officer Riley did not

observe any evidence that Petitioner was injured or had suffered any trauma.  (Tr. 169-71).


**Officer David Pauch**

Pauch was a police officer, assigned to the Firearms Identification Unit.   (Trial

Transcript, July 15, 1999, 183).  Pauch testified that the two bullets recovered from Mathis' brain

during the autopsy were ".32 long caliber copper coated lead bullets."  (Trial Transcript, July 14,

1999, 130-32; Trial Transcript, July 15, 1999, 187).  Officer Pauch further testified, however, that

these bullets had been too damaged to permit further forsenic examination.  (Tr. 188-89).


**Investigator Barbara Simon**

As of November 9, 1998, Simon was employed as an Investigator with the Detroit

Police Department.  (Trial Transcript, July 16, 1999, 4).  On November 10, 1999, Simon interviewed

Petitioner.  (Tr. 4-7).  After acknowledging his various constitutional rights and agreeing to waive

his right to remain silent, Petitioner provided Simon with a statement regarding his involvement in

the shooting of Mikel Mathis.  (Tr. 7-14).  Petitioner acknowledged that he did not like Mathis and

"didn't want him around [his] kids."  (Tr. 17).  Petitioner stated that the previous evening he had told

Mathis that he "wanted to talk to him alone."  (Tr. 15).  According to Petitioner, he and Mathis went

to the Coffee Manor and talked.  (Tr. 15).  After leaving the Coffee Manor, however, the pair began

to argue.  (Tr. 15).  Petitioner stated that "we started hitting each other," at which point Petitioner

pulled out a gun and shot Mathis.  (Tr. 15).  After shooting Mathis, Petitioner "jumped out of the

car" and tossed the gun in a river[1] and then "walked to the City Limits Bar."  (Tr. 15-16).  When

asked whether Mathis had a weapon, Petitioner responded, "no, I didn't see him with one."  (Tr. 16).

Investigator Simon observed no evidence that Plaintiff had suffered any injury.  (Tr. 19-20).


**Dr. Oren Sagher**

At the time of Petitioner's trial, Dr. Sagher was an assistant professor of neurosurgery

at the University of Michigan.  (Trial Transcript, July 19, 1999, 10-17).  Dr. Sagher treated Mikel

Mathis following his shooting.  (Tr. 17-37).  When asked whether Mathis would have been able to

speak after suffering his gunshot injuries, Dr. Sagher stated, "it appears that [Mathis] was [able to

speak] and it would not surprise me."  (Tr. 36).  The doctor also testified that of the four bullets fired

at Mathis, two did not penetrate his skull.  (Tr. 38-39).

---

[1]   The police subsequently attempted to recover the weapon from the Grand River based on information supplied
by Petitioner, but the dive team was unsuccessful.  (Trial Transcript, July 16, 1999, 19-23, 58-67).

**Derrick Auger**

Auger testified that he had been friends with Mikel Mathis for 7-8 years prior to his death. (Trial Transcript, July 19, 1999, 48). Auger was also friends with Shannon Bahorski and the two would often socialize. (Tr. 48-49, 68-70). Auger testified that Mathis and Bahorski began dating the previous Fall. (Tr. 49).

Auger also related an incident that occurred approximately one week before Mathis was shot. (Tr. 51-59, 71-80). He and Bahorski had gone out to a bar that evening to visit. (Tr. 51-55). After leaving the bar, Auger observed that Petitioner was following them. (Tr. 56-59, 71-75). Auger was eventually able to get away from Petitioner. (Tr. 57-59, 71-75). Auger again encountered Petitioner on November 9, 1998, at the Bahorski residence. (Tr. 75-80). Petitioner told Auger that he "should mind [his] own business." (Tr. 80).

**Michael Paul Tudor**

Petitioner met Mikel Mathis in late October 1998, "just before Halloween." (Trial Transcript, July 19, 1999, 123). Petitioner first encountered Mathis at Shannon Bahorski's residence. (Tr. 123-24). Petitioner testified that he was "uncomfortable" in Mathis' presence because he felt that Mathis "was trying to intimidate" him. (Tr. 125). Petitioner later told Bahorski that "Mathis seemed like he was acting like a tough guy and [he] didn't really want him around [his] children." (Tr. 127). Petitioner related these feelings to Bahorski "several times." (Tr. 127-28).

Petitioner acknowledged that on November 3, 1998, he asked Shannon Bahorski to marry him. (Trial Transcript, July 19, 1999, 123). Petitioner testified that he was "upset" when Bahorski rejected his proposal. (Tr. 123).

16

Petitioner acknowledged that when he went to Bahorski's residence on November 6, 1998, he took a baseball bat with him. (Tr. 128-29). Petitioner testified that he took the baseball bat with him because he wanted "to confront Mr. Mathis." (Tr. 129). Petitioner testified that when Mathis subsequently exited the house and walked towards him, he "stuck the bat out in front of [him] and told [Mathis] that's far enough." (Tr. 130). In response, Mathis "stopped." (Tr. 130). Petitioner then told Mathis that he did not want him "around [his] kids." (Tr. 131). Petitioner acknowledged that during this particular visit to the Bahorski residence he told Virginia Millross "to mind her own fucking business and go in the house." (Tr. 132). Petitioner testified that later that evening he returned to the Bahorski residence and stole the gun from the closet in Sharon Bahorski's bedroom. (Tr. 135). Petitioner claimed that he stole the weapon because he feared "being jumped" by Mikel Mathis. (Tr. 136).

Petitioner acknowledged that when he encountered Derrick Auger on November 9, 1998, he told Auger to "mind his own business." (Tr. 128). Petitioner also acknowledged telling Sharon Bahorski, on November 9, 1998, that "if Shannon was dating Mr. Mathis [he] would cut his ear off." (Tr. 137).

Petitioner returned to the Bahorski residence between 8:45-9:00 p.m. on the evening of November 9, 1998. (Tr. 138-40). When he arrived, Petitioner had in his possession the weapon he had stolen three days earlier. (Tr. 141). Petitioner acknowledged that he got "mad" when he saw that Mikel Mathis was there with Shannon Boharski and her children. (Tr. 191). Nonetheless, soon after arriving, Petitioner asked Mathis "if he'd like to go have coffee to discuss things." (Tr. 141-42). Petitioner and Mathis departed a few minutes later in Mathis' car. (Tr. 143). The pair went to the Coffee Manor where they talked and drank coffee for approximately fifteen minutes. (Tr. 144-

17

45).  During this discussion, Petitioner "did most of the talking" and his concerns were not "resolved" when they departed the Coffee Manor.  (Tr. 145).

According to Petitioner, after leaving the Coffee Manor, Mathis drove his car to a nearby alley.  (Tr. 146).  After stopping the car, Mathis told Petitioner to "stay the fuck away from Shannon."  (Tr. 146).  Petitioner responded that he would "never" do that.  (Tr. 146).  Petitioner testified that Mathis then hit him in the side of the head.  (Tr. 147).  Petitioner attempted without success to retaliate, after which Mathis allegedly "grabbed [Petitioner] by the throat" and held him against the passenger side car window.  (Tr. 147-48).  Petitioner testified that he started "feeling like [he] was going to black out," at which point he "pulled [his] gun out" and shot Mathis.  (Tr. 149).  Petitioner testified that he then exited the car, discarded the weapon in a nearby river, and then walked to the City Limits bar.  (Tr. 149-51).

Following a jury trial, Petitioner was convicted of first degree murder and possession of a firearm during the commission of a felony.  (Trial Transcript, July 22, 1999, 3-4).  Petitioner received a sentence of two years for possession of a firearm during the commission of a felony and was sentenced to serve life in prison for first degree murder.  (Sentence Transcript, August 20, 1999, 16).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.    There was insufficient evidence as a matter of law to establish Appellant Michael Tudor's conviction for premeditated murder in the first degree as required by the Due Process Clause.
>
> II.   The trial court abused its discretion and denied Appellant a fair trial by allowing evidence of highly prejudicial and irrelevant evidence of Appellant's suicide attempt and his alleged following of the

18

complainant's friend over the defense objection.

III.    The trial court committed reversible error by
        foreclosing any possibility of having testimony reread
        and denied Appellant Michael Tudor a fair trial.

IV.    The trial court clearly erred by failing to suppress an
        incriminating statement attributed to the Appellant in
        violation of his right against self-incrimination
        guaranteed by both the state and federal constitutions.

V.      Appellant was denied a fair trial where the trial court
        erroneously allowed the complainant's hearsay
        statement under the dying declaration exception.

VI.    Appellant Michael Tudor was denied a fair trial by the
        prosecutor's misconduct throughout the trial and
        violated his state and federal right to due process.

VII.   The cumulative effect of the foregoing errors denied
        Appellant Michael Tudor a fair trial and requires
        reversal.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Tudor*,

No. 222684, Opinion (Mich. Ct. App., February 1, 2002). Asserting claims I, II, VI, and VII above,

Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's

request for leave to appeal, stating that "we are not persuaded that the questions presented should

be reviewed by this Court." *People v. Tudor*, No. 121134, Order (Mich., September 30, 2002).

Petitioner subsequently filed in the trial court a motion for relief from judgment,

which was denied on April 2, 2004.[2] *People v. Tudor*, No. 98-013581, Order (Wayne County Cir.

Ct., April 2, 2004). Petitioner then moved in the Michigan Court of Appeals for leave to appeal,

asserting the following claims:

---

[2]  It is not clear from the record what issues Petitioner asserted in this motion.

19

I.      Defendant was denied his state and federal constitutional rights to effective assistance of trial counsel where counsel failed to investigate the potential for raising an insanity defense at trial.

II.     Defendant was denied his state and federal constitutional rights to due process and a fair trial when the prosecutor interrupted defense counsel during closing argument for the express purpose of prejudicing the jury against the Defendant by enlisting their sympathy for the victim.

III.    Defendant's non-parolable mandatory life sentence for first degree murder violates the Michigan Constitution because it is not an indeterminate sentence and because it constitutes cruel or unusual punishment.

IV.     Defendant was denied his state and federal constitutional rights to effective assistance of counsel in his first appeal of right:

        A.      Appellate counsel ineffectively failed to investigate the potential of trial counsel being ineffective for failing to raise an insanity defense at trial.

        B.      Appellate counsel ineffectively failed to raise a controversial non-frivolous issue that the non-parolable mandatory life sentence for first-degree murder violates the Michigan Constitution because it is not an indeterminate sentence and because it constitutes cruel or unusual punishment.

        C.      Appellate counsel ineffectively failed to raise a non-frivolous and flagrant prosecutorial misconduct issue on appeal after having raised several other prosecutorial misconduct issues in her brief on appeal.

V.     Defendant's mental impairment of being learning disabled and borderline illiterate made it impossible for him to identify the legal basis for the issues being raised in this state collateral appeal and therefore made him unable to adequately assist appellate counsel in this regard, thus providing "good cause" for Defendant's failure to raise these issues on direct appeal.

The Michigan Court of Appeals denied Petitioner's request "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Tudor*, No. 259063, Order (Mich. Ct. App., June 24, 2005). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Tudor*, No. 129139, Order (Mich., Nov. 29, 2005). On December 13, 2005, Tudor initiated the present action, asserting the following claims:

I.     Petitioner was denied Fifth and Fourteenth Amendment rights to due process because there was insufficient evidence as a matter of law to support the conviction for first-degree premeditated murder.

II.    Petitioner was denied his Fifth and Fourteenth Amendment rights to due process of law and a fair trial when the trial court allowed evidence to be admitted including: (1) highly prejudicial and irrelevant evidence of Petitioner's suicide attempt, and (2) evidence of Petitioner allegedly following Ms. Bahorski's friend in a car chase.

III.   Petitioner was deprived of his Fifth and Fourteenth Amendment rights against self-incrimination where the trial court failed to suppress a custodial statement taken from the Petitioner involuntarily and where Petitioner was denied access to an attorney before the interrogation.

21

IV.     Petitioner was deprived of his Fifth and Fourteenth Amendment rights to due process and a fair trial when the prosecutor committed numerous instances of prosecutorial misconduct:

     a.     the prosecutor improperly denigrated defense counsel and diminished Petitioner's presumption of innocence.

     b.     the prosecutor improperly sought to instill sympathy for the victim and his family.

     c.     the prosecutor improperly argued facts not in evidence and interjected his personal opinion.

     d.     the cumulative effect of the prosecutor's comments requires a new trial because the errors prejudiced the Petitioner's defense.

V.      The cumulative effect of the errors addressed in grounds one through four of this petition for writ of habeas corpus deprived the petitioner of his Fifth and Fourteenth Amendment rights to due process and a fair trial.

VI.     Defendant was denied his Sixth and Fourteenth Amendment rights to effective assistance of trial counsel where counsel failed to investigate the potential for raising an insanity defense at trial.

VII.    Petitioner was denied his Fifth and Fourteenth Amendment rights to due process and a fair trial when the prosecutor interrupted defense counsel during closing argument for the express purpose of prejudicing the jury against the Petitioner by enlisting their sympathy for the victim.

VIII.   Petitioner was denied his Fourteenth Amendment right to effective assistance of counsel in his first appeal of right:

a.   appellate counsel ineffectively failed to investigate the potential of trial counsel being ineffective for failing to raise an insanity defense at trial.

b.   appellate counsel ineffectively failed to raise a non-frivolous and flagrant prosecutorial misconduct issue on appeal after having raised several other prosecutorial misconduct issues in her brief on appeal.

## **STANDARD OF REVIEW**

Tudor's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

23

extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's]

24

precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

**I.**     **Sufficiency of the Evidence Claim**  (Habeas Claim I)

Petitioner asserts that he is entitled to habeas relief because his conviction for first degree murder is not supported by sufficient evidence. Specifically, Petitioner claims that there does not exist sufficient evidence that he acted with premeditation in the killing of Mikel Mathis. Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a

reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.  *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect at the time of Mikel Mathis' murder, an individual was guilty of first degree premeditated murder if the following elements were satisfied: (1) the defendant intentionally killed the victim, and (2) the killing was deliberate and premeditated.  *People v. Wofford*, 492 N.W.2d 747, 749 (Mich. Ct. App. 1992).  Premeditation and deliberation require "sufficient time to allow the defendant to take a second look."  *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992).  Premeditation and deliberation may be inferred from the circumstances surrounding the killing.  Furthermore, premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the killing.  *Id.*

When viewed in a light most favorable to the prosecution, the evidence is more than sufficient to support Petitioner's conviction for first degree murder.  The evidence revealed that Petitioner harbored great antipathy towards Mathis and had threatened to commit bodily harm

against him.  Petitioner subsequently stole a handgun.  Several days later, Petitioner, armed with the stolen weapon, lured Mathis away from a group of people and shot him in the head four times.  After shooting Mathis, Petitioner discarded the weapon and made no attempt to contact the authorities or surrender himself for questioning.

Petitioner's claim that he acted in self-defense is contradicted by his actions following the shooting, as well as the complete absence of evidence that Mathis attacked him as alleged. Petitioner's alleged rationale for arming himself with a stolen weapon likewise does not survive scrutiny.  Petitioner claimed that he armed himself with a weapon because he feared Mathis.  This testimony is inconsistent with Petitioner requesting to meet privately with Mathis to merely drink coffee and talk.  In sum, the evidence more than supports the jury's conclusion that Petitioner acted with the requisite deliberation.

The Michigan Court of Appeals concluded that "[v]iewed in a light most favorable to the prosecution, the evidence was sufficient to enable a rational trier of fact to infer premeditation beyond a reasonable doubt."  *People v. Tudor*, No. 222684, Opinion at 1 (Mich. Ct. App., February 1, 2002).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.


**II.**        **Evidentiary Claim**  (Habeas Claim II)

As noted above, Derrick Auger testified that approximately one week before Mathis

27

was shot, he observed Petitioner following him and Shannon Bahorski.  Also, evidence was presented regarding an alleged suicide attempt that Petitioner undertook in February 1998.  Petitioner asserts that admission of this evidence denied him of the right to due process and a fair trial.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.  *Id.*

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.  *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  However, if "an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Id.*  Fundamental fairness does not, however, "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994), and courts have defined those violations that violate fundamental fairness "very narrowly."  *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.* (citations omitted).

Prior to trial, Petitioner moved to exclude the evidence in question.  (Motion Transcript, July 12, 1999, 2-6).  The trial court granted in part and denied in part Petitioner's motions. (Tr. 15-19).  Specifically, with respect to the incident involving Derrick Auger, the court ruled that evidence of the alleged incident was admissible on the question of Petitioner's "mind and feelings toward Ms. Bahorski," but was not admissible to establish Petitioner's state of mind as to Derrick Auger or to Mikel Mathis. (Tr. 15-16).  As for the evidence regarding Petitioner's February

28

1998 suicide attempt, the court ruled that while the evidence was not relevant to show that Petitioner

killed Mikel Mathis it was relevant to show "the intensity of [Petitioner's] feelings and his thoughts

towards Ms. Bahorski and the two children involved here which are [Petitioner's] children. (Tr. 18).

The court further ruled that on this question, the evidence at issue was "more probative than

prejudicial." (Tr. 18).

   The decision by the trial court to admit the evidence in question was reasonable and

did not deprive Petitioner of a fair trial. As the Michigan Court of Appeals concluded:

> we find no abuse of discretion in the trial court's decision to allow the
> evidence. As the trial court correctly observed, the evidence was
> relevant to show the nature of [Petitioner's] relationship with his ex-
> girlfriend and, in particular, the intensity of his feelings towards her
> and their children. The evidence was probative of [Petitioner's]
> motive to kill a rival to that relationship.

*People v. Tudor*, No. 222684, Opinion at 1-2 (Mich. Ct. App., February 1, 2002) (internal citations

omitted). In light of the above authority and facts, the Court concludes that this decision is neither

contrary to, nor involves an unreasonable application of, clearly established federal law.

Furthermore, this decision was not based on an unreasonable determination of the facts in light of

the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be

granted.


**III.**   **Prosecutorial Misconduct Claims**  (Habeas Claim IV)

   Petitioner asserts that the prosecuting attorney engaged in misconduct, depriving him

of his constitutional right to a fair trial. As the Sixth Circuit has stated, "[w]hen a petitioner makes

a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the

29

trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Thus, even if the challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897. When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court must consider the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

### A. Jury Selection and Opening Statements

Petitioner objects to several comments made by the prosecutor during jury selection and opening statements. The comments at issue are identified below.

### 1. Showing Mikel Mathis' Photograph to the Jurors

During the jury selection process, the prosecutor showed the jurors a photograph of Mikel Mathis, at which time the prosecutor made the following comments:

> Good afternoon. I should begin, because I neglected to and it was insensitive of me before and I apologize to his father who is in the courtroom. The person that we're here about, who is not here himself. I need you to look at this individual. This is Mr. Mikel Mathis.

(Trial Transcript, July 12, 1999, 68).

Petitioner argues that these comments, along with the presentation of a photograph of the victim, were improper and deprived him of a fair trial.


### 2.      Inattentiveness Comment

Petitioner asserts that the following exchange, which occurred between the prosecutor and a potential juror during jury selection, deprived him of a fair trial:

> Prosecutor:      If you don't listen to my witnesses and the Peoples' witnesses, who's going to get hurt more Mr. Watts?
>
> Juror:             You.
>
> Prosecutor:      Most likely.  There's a chance it might not be that way.  But in all likelihood, Mr. Mathis, whose picture there and his family, the[ir] chances for justice are going to be hurt by your inattentiveness.  And I'm not picking on you Mr. Watts.  I'm not saying that you're not going to pay attention, do you understand?

Petitioner argues that "cautioning the jury that the victim and his family would be hurt by their inattentiveness at trial," was improper and denied him of the right to a fair trial.


### 3.      Reference to Mikel Mathis

Petitioner asserts that the following exchange, which occurred between the prosecutor and a potential juror during jury selection, deprived him of a fair trial:

> Prosecutor:     Thank you, Mr. Kennedy.   Counsel

has touched on sympathy.  Do you
understand that the flip side of that is
all I can do in regards to Mr. Mathis is
show you a picture on a piece of paper
of him.  Do you understand that?

Juror:           I understand.

Prosecutor:      Other than that, he's just a word to
you and just a name, right?

Juror:           Right.

Prosecutor:      He doesn't, you don't see him yawn or
stretch or sit down or get up or do any
of the things that human beings do,
right?

Juror:           Right.

(Trial Transcript, July 13, 25-26).


    4.       **Comment Concerning Victim's Father**

The following exchange occurred between the prosecutor and a potential juror

regarding the juror's admission that she had previously been convicted of shoplifting.  (Tr. 37).

Prosecutor:      Miss Capshaw, your situation that
you've encountered sometime back in
Dearborn, does that leave you with a
bad taste toward judges?

Juror:           No.

Prosecutor:      Toward prosecutors?

Juror:           No.

Prosecutor:      Toward police?

| | |
|---|---|
| Juror: | No. |
| Prosecutor: | So if you are permitted to sit in this case and the deceased's father comes over to me and says 'I'm a little concerned about that Miss Capshaw, you know, she's been in a little trouble.' Should I be concerned about that comment or can I just tell him you are going to enter this case with a fair and open mind? |
| Juror: | You should have no concerns. |

Petitioner asserts that the prosecutor's comment regarding the victim's father denied him the right to a fair trial.

5.      Thanking the Jurors

At the very outset of his opening statement to the jury, the prosecutor made the following comments which Petitioner asserts deprived him of the right to a fair trial:

| | |
|---|---|
| Prosecutor: | I'm going to begin my comments to the fourteen of you by first expressing some gratitude.  From the last day and a half of listening to people answer questions from where you're sitting, it's pretty much fair to say that if you didn't want to be where you're at, you could have probably found a way out.  And, because the fourteen of you elected not to do that, I want to thank you on behalf of the People in the state of Michigan, on behalf of the Court, on behalf of the family members of Mr. Mikel Mathis. |

(Tr. 85-86).

33

6.      Gentle Giant

In his opening statement to the jury, the prosecutor stated that "Mr. Mathis, although, being a big person, you'll hear testimony he's kind of a gentle giant." (Tr. 89). Petitioner asserts that referring to Mikel Mathis as a "gentle giant" deprived him of the right to a fair trial.

The Court fails to discern how any of these comments unfairly prejudiced the jury or denied Petitioner of the right to a fair trial. The Court recognizes that a prosecuting attorney has a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Puertas v. Overton*, 168 Fed. Appx. 689, 701 (6th Cir., Feb. 13, 2006) (quoting *Viereck v. United States*, 318 U.S. 236, 248 (1943)). However, "unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000). It is not reasonable to characterize the comments in question as constituting an attempt to incite the jury's passions and prejudices.

B.      Prosecutor's Closing Argument

Petitioner asserts that during his closing argument, the prosecutor "argued facts not in evidence and interjected his personal opinion." While it is improper for an attorney to express a personal opinion or belief as to the truth or falsity of any testimony, an attorney "must be given leeway to argue reasonable inferences from the evidence." *United States v. Collins*, 78 F.3d 1021, 1039-1040 (6th Cir. 1996). Moreover, where there is conflicting testimony, "it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying." *Id.* Furthermore, so long as he does not improperly vouch for a witness, it is proper for the prosecutor to review the evidence presented and comment on the strength of the State's case. *United States v. Reliford*, 58 F.3d 247,

34

250-51 (6th Cir. 1995).  Improper vouching occurs only when a jury could "reasonably believe that the prosecutor was indicating a personal belief in a witness' credibility."  *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993).  A review of the record, however, reveals that the prosecutor was doing nothing more than arguing what he believed the evidence revealed about the nature of the crime and the manner in which it was committed.

### C.      Prosecutor's Rebuttal Argument

Petitioner asserts that in his rebuttal argument to the jury, the prosecutor "made numerous attacks on defense counsel."  Petitioner asserts that the prosecutor's comments "were done with the intent of denigrating defense counsel and ultimately shifted the burden of proof from the State to the Petitioner."  A review of the record reveals otherwise.  In his brief rebuttal argument, the prosecutor did not denigrate defense counsel or shift the burden of proof.  Instead, the prosecutor simply responded to the arguments advanced by Petitioner's counsel during his lengthy closing argument to the jury.

In sum, the Court fails to discern how the challenged comments mislead the jury or prejudiced Petitioner.  It is not reasonable to assert that the challenged comments made by the prosecutor during jury selection or opening statements unfairly prejudiced Petitioner by engendering sympathy for the victim.  As for the prosecutor's closing arguments, the prosecutor was simply arguing the facts in evidence and the reasonable inferences therefrom.  Moreover, the evidence against Petitioner was simply overwhelming.

With respect to these claims, the Michigan Court of Appeals concluded that "defendant has not established any error, singularly or cumulatively, and defendant was not denied

a fair trial." *People v. Tudor*, No. 222684, Opinion at 3 (Mich. Ct. App., February 1, 2002). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.**      **Cumulative Effect Claim**  (Habeas Claim V)

Petitioner asserts that he is entitled to habeas relief based on the "cumulative effect" of the errors which occurred during his trial. First, Petitioner has failed to identify any errors or violations of federal law which occurred during his trial. Furthermore, as the Sixth Circuit has made clear, habeas relief cannot be premised upon an alleged accumulation of errors. *See Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).

**V.**      **Unexhausted Claim**  (Habeas Claim III)

A petition for writ of habeas corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement "is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008) (citation omitted). As noted above, Petitioner made a statement to the police following his arrest. Over Petitioner's objections this statement was admitted at trial. Petitioner claims that admission of this statement violated his constitutional rights because he was denied access to an attorney before making the statement and, furthermore, because his

decision to speak with the police was not made voluntarily.

Petitioner has not, however, properly exhausted these claims.  Petitioner presented these claims to the Michigan Court of Appeals on direct appeal, but he did not present them to the Michigan Supreme Court in his subsequent appeal of Michigan Court of Appeals' decision. Moreover, Petitioner did not assert these claims in his post-conviction motions for relief before the Michigan Court of Appeals or the Michigan Supreme Court.  Petitioner has, therefore, failed to properly exhaust these particular claims.  Petitioner's failure to exhaust notwithstanding, these claims may nonetheless be denied on the merits.  *See* 28 U.S.C. § 2254(b)(2).  As discussed below, these claims are without merit.

While not clearly articulated as such, Petitioner's claim, read indulgently, presents three related but distinct issues.  First, Petitioner claims that his request for an attorney was disregarded in violation of his Sixth Amendment right to counsel.  Next, Petitioner claims that his Fifth Amendment right to counsel was violated when he was questioned by the police despite requesting the assistance of counsel.  Petitioner further claims that his decision to waive his *Miranda* rights and speak to the police was the result of improper coercion.  Petitioner argues that as a result of these violations of his constitutional rights his statement to the police implicating himself in the murder of Mikel Mathis should have been excluded from evidence.  The Michigan Court of Appeals addressed (and denied) Petitioner's claim that he was coerced to waive his *Miranda* rights and speak to the police.  Accordingly, the state court's resolution of this issue is subject to the deferential standard articulated by the AEDPA.

The Michigan courts, however, did not address Petitioner's claims that his Fifth and Sixth Amendment rights to counsel were violated.  The deferential standard articulated by the

AEDPA does not apply if the state has failed altogether to review a particular claim.  As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  In such circumstances, the court conducts a *de novo* review.[3]  *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

As discussed above, shortly after shooting Mikel Mathis, Petitioner was interviewed by Investigator Barbara Simon.  During this interview, Petitioner acknowledged shooting Mikel Mathis.  Prior to trial, Petitioner moved to exclude from evidence the statement he made to Investigator Simon.  The trial court conducted a hearing on the matter, at which Petitioner testified.

Petitioner testified that he was arrested "around" 2:30 a.m. on the morning of November 10, 1998, and transported to the Redford Township Police Station.  (Hearing Transcript, March 19, 1999, 28-30).  Petitioner claims that after arriving at the police station he "requested a phone call to call [his] father for an attorney."  (Tr. 30).  Petitioner was instructed that he "would have to wait" until he was transported "to homicide."  (Tr. 30-31).

Petitioner testified that approximately 30 minutes after arriving at the Redford Township Police Station he was transported to another location by a "Detroit Police Officer."  (Tr.

---

[3]   The Court recognizes that because Petitioner failed to present these claims to the Michigan Supreme Court, it is not accurate to conclude that the *entire* Michigan court system failed to review these claims.  Nevertheless, the fact remains that with respect to these claims there exists no state court decision to which the Court can defer.  Having failed to locate controlling authority addressing this particular circumstance, the Court opts to err in favor of reviewing these claims pursuant to the more generous de novo standard.  The Court finds that Respondent is not prejudiced by such, as these claims are clearly without merit.

31).  Petitioner asserted that after being transported, he asked "the guys that were booking [him] if [he could] have a call to call [his] dad to get an attorney."  (Tr. 31-33).  Petitioner's requests were denied.  (Tr. 34).  After his booking was complete, Petitioner was held in the "back" of the facility.  (Tr. 34).  While he was in the "back," Petitioner allegedly asked the "turnkey" if he "could have a phone call to call [his] father to get an attorney."  (Tr. 34).  Petitioner testified that these requests were denied.  (Tr. 34).  Petitioner was subsequently interviewed by Investigator Simon, beginning at approximately 9:00 a.m.  (Tr. 32-34).  Petitioner asserts that his requests for counsel were ignored in violation of his constitutional rights, rendering his later statement to Investigator Simon inadmissible.  The Court disagrees.

A criminal defendant's right to counsel is protected by both the Fifth and Sixth Amendments to the United States Constitution.  However, the nature of the right to counsel protected by each Amendment differs significantly.  The Sixth Amendment right to counsel does not attach until the "initiation of adversary judicial criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 1888 (1984)).  Because adversary judicial proceedings had not yet been initiated when Petitioner allegedly made his requests for counsel, the denial of Petitioner's requests does not violate his Sixth Amendment right to counsel because his Sixth Amendment right to counsel had not yet attached.  Petitioner's Fifth Amendment right to counsel was likewise not violated by this alleged conduct.

A criminal defendant's Fifth Amendment right to counsel stems from the Supreme Court's decision in *Miranda v. Arizona*, in which the Court held that the Constitution's protection against compelled self-incrimination requires that "custodial interrogation be preceded by advice to

the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).   Accordingly, a criminal defendant has the right (protected by the Fifth Amendment) to have counsel present during custodial interrogation.  *See Edwards*, 451 U.S. at 482.

In *Edwards*, the Court expounded upon this right, holding that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  *Id.* at 484.  The Court further held that "an accused. . .having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Id.* at 484-85.  The rule articulated in *Edwards* is designed to protect the right to counsel recognized in *Miranda*.  Petitioner appears to assert that his Fifth Amendment right to counsel was violated when Investigator Simon interviewed him despite his previous requests for counsel, thereby violating the rule articulated in *Edwards*.  The Court disagrees for two reasons.

First, the *Edwards* rule applies only where the individual has unambiguously requested the assistance of counsel.  *United States v. Suarez*, 263 F.3d 468, 482 (6th Cir. 2001) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)).  The request for counsel "cannot be for just any sort of assistance, but for the particular sort of lawyerly assistance that is the subject of *Miranda*."  *Suarez*, 263 F.3d at 482 (quoting *McNeil*, 501 U.S. at 179).  This requires, "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*."  *McNeil*, 501 U.S.

at 178 (emphasis in original).  The "mere fact that the government is aware that a suspect has an attorney, or is soon to have one, does not unambiguously assert the suspect's right to deal exclusively with the police through counsel during custodial interrogation." *Suarez*, 263 F.3d 468, 483 (6th Cir. 2001) (citing *McNeil*, 501 U.S. at 177-82).  While Petitioner's requests to telephone his father concerning an attorney may very well express an interest in obtaining counsel, such does not come close to constituting an *unambiguous* request "to deal exclusively with the police through counsel during custodial interrogation."  The Court's conclusion in this regard is informed both by the specific content of Petitioner's requests, as well as the fact that when Petitioner made these various requests he was not being questioned (nor had he yet been subject to questioning).  Had Petitioner made his requests during (or following) questioning, the Court might very well have reached a different conclusion.

Moreover, even had Petitioner's requests constituted an unambiguous desire "to deal exclusively with the police through counsel during custodial interrogation," the result would nonetheless be the same because Petitioner's Fifth Amendment right to counsel had not yet attached. As the *McNeil* Court observed

> We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation' - which a preliminary hearing will not always, or even usually, involve. If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect.  Most rights must be asserted when the government seeks to take the action they protect against.  The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

*McNeil*, 501 U.S. at 182 n.3 (internal citations omitted).

The Sixth Circuit, albeit in an unpublished decision, has likewise declined to extend the protections articulated in *Miranda* and *Edwards* to circumstances such as those presented by Petitioner's claim. *See United States v. Little*, 1993 WL 453396 at *5-6 (6th Cir., Nov. 4, 1993) ("Attention to the *Miranda-Edwards* line of cases, however, demonstrates that an expressed desire for counsel for the purpose of interrogation is not enough; for the right to counsel to be invoked, the right must also exist at the time the request is made. The Supreme Court has 'in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation') (quoting *McNeil*, 501 U.S. 182). This conclusion is certainly consistent with the Supreme Court's observation that since "the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good. . .[a]dmissions of guilt resulting from valid *Miranda* waivers are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Texas v. Cobb*, 532 U.S. 162, 172 (2001) (quoting *McNeil*, 501 U.S. at 181).

Petitioner's Fifth Amendment right to counsel did not attach until he was subject to custodial interrogation. While Petitioner was certainly in custody when he made the aforementioned requests to telephone his father regarding an attorney there is no evidence that Petitioner was being interrogated (or had yet been subjected to) interrogation when he made his requests. Thus, Petitioner's Fifth Amendment right to counsel was not denied by the alleged failure to permit Petitioner to telephone his father concerning an attorney. In sum, the Court concludes that Petitioner did not suffer a violation of his constitutional right to counsel as a result of the denial of his requests for counsel discussed above.

Petitioner also asserts that despite the fact that Investigator Simon informed him of his *Miranda* rights, which he immediately waived, his subsequent statement to Simon should have been excluded from evidence.  Specifically, Petitioner asserts that his waiver of his *Miranda* rights was not voluntary, but was instead the product of coercion.

The Supreme Court has long recognized that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination." *Thompkins v. Berghuis*, 2008 WL 4923016 at *8, - - - F.3d - - - (6th Cir., Nov. 19, 2008) (quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)).  Courts "must presume that a defendant did *not* waive his rights" and the prosecutor's burden to demonstrate otherwise "is great." *Thompkins*, 2008 WL 4923016 at *8 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

The trial court conducted a hearing prior to trial on Petitioner's motion to suppress his statement to Investigator Simon.  Petitioner testified that before advising him of his *Miranda* rights Investigator Simon told him that "if [he] didn't cooperate, she was going to take [his] kids."  (Hearing Transcript, March 19, 1999, 37-38).  According to Petitioner, after making this statement Investigator Simon informed him of his *Miranda* rights.  (Tr. 38-39).  Petitioner testified that he acknowledged understanding his *Miranda* rights and that he agreed to waive these rights and speak with Investigator Simon.  (Tr. 41-46).  Petitioner claimed that he spoke with Investigator Simon because he did not want his children "to be taken away."  (Tr. 40).

Petitioner's statement to Investigator Simon was subsequently reduced to writing. (Tr. 40).  Petitioner's written statement included the following question (inserted by Investigator Simon), "Mr. Tudor, did I threaten you in any way to make your statement or answer any question?" (Tr. 42).  Petitioner acknowledged that his response to this question (included as part of his written

43

statement) was "no."  (Tr. 42-43).  Petitioner's written statement also included the following question (inserted by Investigator Simon), "Mr. Tudor, did I promise you anything to make a statement or answer any question?"  (Tr. 43).  Petitioner acknowledged that his response to this question (included as part of his written statement) was "no."  (Tr. 43).  Petitioner's written statement also included the following question (inserted by Investigator Simon), "Is this statement you gave and the questions you answered true?"  (Tr. 43-44).  Petitioner acknowledged that his response to this question (included as part of his written statement) was "yes."  (Tr. 44).  Petitioner further acknowledged that he failed to include in his written statement any mention of the alleged threats that Investigator Simon made to him regarding his children.  (Tr. 44-45).

Investigator Simon testified that before questioning Petitioner about the shooting of Mikel Mathis she provided Petitioner with a "Constitutional Rights Certification and Notification Form."  (Hearing Transcript, February 25, 1999, 12-15).  This Form informed Petitioner of the following: (1) that he had the right to remain silent and to not answer any questions or make any statements; (2) that any statement he made or anything he said would be used against him in a court of law; (3) that he had the right to have a lawyer present "before and during the time" he answers any questions or makes any statement; (4) if he cannot afford a lawyer, one will be appointed for him without cost prior to any questioning; and (5) he can decide at any time to exercise his rights and not answer any questions or make any statement.  (Tr. 24-25).  The Notification Form concluded with the following statement:

> I understand that these are my rights under the law.  I have not been threatened or promised anything and I now desire and agree to answer any questions put to me or make a statement.

(Tr. 25).

44

Simon testified that after confirming that Petitioner could read and write, she had Petitioner "read each right" out loud to her. (Tr. 15-16). According to Simon, after Petitioner read a particular right out loud, she asked him "if he understood it." (Tr. 16). After responding that he understood each of these rights, Petitioner placed his initials next to the paragraph in question on the Notification Form. (Tr. 16). Petitioner then read aloud the Form's concluding statement and signed the Notification Form and agreed to make a statement. (Tr. 17-18, 25).

After Petitioner's statement was reduced to writing, it was provided to Petitioner so that he could make any corrections thereto. (Tr. 20-21). Petitioner then signed the statement. (Tr. 21). Simon testified that Petitioner never asked her to stop the interview or indicated that he did not wish to speak with her. (Tr. 23-24). Petitioner never requested an attorney or asked that the interview be stopped so that he could get an attorney. (Tr. 24). Simon testified that Petitioner did not appear to be under the influence of drugs or alcohol and that he appeared to acting voluntarily. (Tr. 15). Simon further testified that Petitioner did not appear to be suffering from lack of food or water. (Tr. 23). Simon testified that she did not threaten Petitioner, promise him anything, or say anything which could be interpreted as coercive or forceful. (Tr. 18-20).

The trial court denied Petitioner's motion to suppress. (Tr. 65-67). The court found Petitioner's allegations less than credible and instead found that Petitioner had been properly informed of his *Miranda* rights and that his subsequent waiver of these rights was voluntary. (Tr. 65-67). The Michigan Court of Appeals found "no error" in the trial court's determination. *People v. Tudor*, No. 222684, Opinion at 2 (Mich. Ct. App., February 1, 2002). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not

45

based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**VI.**          **Procedurally Defaulted Claims** (Habeas Claims VI, VII, and VIII)

Petitioner has procedurally defaulted his remaining claims.  Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court. *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually enforced the state procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004).

It must be remembered, however, that for the procedural default doctrine to apply, "the last state court rendering a judgment in the case must have based its judgment on the procedural default."  *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).  Furthermore, review by a state court of a procedurally defaulted claim to prevent manifest injustice does not constitute a review on the merits sufficient to excuse procedural default.  *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir.

46

2006) ("a state court's plain error analysis does not save a petitioner from procedural default").

   If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Bagley*, 380 F.3d at 966 (citing *Coleman*, 501 U.S. at 750).

   With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Johnson v. Wilson*, 187 Fed. Appx. 455, 458 (6th Cir., June 16, 2006). To establish that a miscarriage of justice would result from the failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991). To satisfy this requirement Petitioner must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error "probably resulted" in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324-27 (1995). The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326-27.

   Michigan Court Rule 6.508 provides that a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised in a prior appeal. M.C.R. 6.508(D)(2)-(3). With respect to claims which could have been raised in a prior appeal, a defendant is entitled to relief only if he can establish both "good cause" for failing to assert the issue previously and "actual prejudice" resulting therefrom. M.C.R. 6.508(D)(3). In this context, "actual prejudice" is defined as a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the

conviction should not be allowed to stand."  M.C.R. 6.508(D)(3)(a)-(b).

The Sixth Circuit has held that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constitutes a sufficient determination that the court's conclusion was based on procedural default.  *See Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002).  Furthermore, Rule 6.508(D), regularly followed since 1990, constitutes an independent and adequate state ground, the reliance on which precludes federal review of those issues against which it is applied.  *Simpson*, 238 F.3d at 407.

In his remaining claims, Petitioner asserts that: (1) his trial attorney rendered ineffective assistance; (2) his appellate counsel rendered ineffective assistance; and (3) the prosecuting attorney acted improperly when he interrupted defense counsel during closing arguments.  Petitioner did not assert these claims in his direct appeal as of right.[4]  He did, however, present these claims in his post-conviction motions for relief.  As previously noted, Petitioner's motion for relief from judgment was denied by the Michigan Court of Appeals and the Michigan Supreme Court on the ground that Petitioner failed to comply with Michigan Court Rule 6.508(D).  Petitioner has, therefore, procedurally defaulted these particular claims.

Petitioner has failed to establish that good cause exists for his failure to properly raise these issues on his direct appeal as of right.  However, even if the Court assumes that Petitioner can demonstrate good cause, he is still not entitled to relief because he cannot establish that he will suffer prejudice or that a fundamental miscarriage of justice will result from the Court's failure to consider

---

[4]  The Court recognizes that Petitioner cannot have been expected to assert in the Michigan Court of Appeals the claim that his appellate counsel was ineffective, as such a claim would not have matured until after the denial of his appeal to that court.  However, when Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal the decision by the Michigan Court of Appeals, Petitioner was not represented by counsel.  Thus, Petitioner could have asserted his ineffective assistance of appellate counsel claim on direct review to the Michigan Supreme Court.  Petitioner failed to do so, however.

these claims, as they are without merit.

        A.      Prosecutorial Misconduct  (Habeas Claim VII)

       During Petitioner's closing argument, the following exchange occurred between Petitioner's attorney and the prosecutor:

| | |
|---|---|
| Petitioner's Counsel: | Well, let's get into it now.  Do you remember the statement by Mr. Tudor - - strike that - - by Mr. Mathis, if I had to write down every time I was followed or something like that - - |
| Prosecutor: | Excuse me, Mr. Mathis didn't testify in this case, Mr., Counsel. |
| Petitioner's Counsel: | I apologize, Mr. Auger. |
| Prosecutor: | We would have loved to have him here - - |

(Trial Transcript, July 20, 1999, 32).

       Petitioner asserts that the prosecutor's comments were improper in that they caused the jury to feel sympathy for the victim and thus deprived him of the right to a fair trial.  As discussed above, when examining a claim of prosecutorial misconduct the issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Accordingly, even if the prosecutor's comments were improper, habeas relief is available only if the comments "were so flagrant as to render the entire trial fundamentally unfair."

       The comments in question hardly deprived Petitioner of a fair trial.  The prosecutor simply responded in the heat of the moment to a misstatement by Petitioner's attorney.  While the prosecutor's comment that he "would have loved to have [Mathis] here" was perhaps unnecessary,

the prosecutor's comments were not inaccurate - Mikel Mathis did not testify and the prosecutor surely would have preferred that Mathis survived so that he could testify against Petitioner.  The comments were isolated and highly unlikely to have misled the jury or prejudiced Petitioner.  Furthermore, the evidence of Petitioner's guilt was overwhelming.

B.     Ineffective Assistance of Trial Counsel  (Habeas Claim VI)

Petitioner claims that his trial attorney was ineffective for failing to investigate the potential of pursuing an insanity defense at trial.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms.  *Id.* at 688.  In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th

50

Cir. 2001).

There is no evidence in the record suggesting that Petitioner was insane at the time he murdered Mikel Mathis.  Thus, even if counsel was ineffective for failing to explore the possibility of an insanity defense, Petitioner cannot demonstrate that he was prejudiced by such.

C.      Ineffectiveness of Appellate Counsel  (Habeas Claim VIII)

Petitioner asserts that his appellate counsel rendered ineffective assistance. Specifically, Petitioner claims that his appellate attorney: (1) "failed to investigate the potential of trial counsel being ineffective for failing to raise an insanity defense at trial;" and (2) failed to assert the prosecutorial misconduct claim discussed in section VI(A) immediately above.  As discussed, both of these claims are without merit.  Appellate counsel, therefore, could not have been ineffective for failing to assert such on appeal.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Tudor's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure

to file objections within the specified time waives the right to appeal the District Court's order.

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  January 14, 2009            /s/ Ellen S. Carmody
                                    ELLEN S. CARMODY
                                    United States Magistrate Judge